Slip Op. 25-117

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BRANDON CHEN,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, and UNITED STATES DEPARTMENT OF THE TREASURY,<br><br>    Defendants. | Before: Jane A. Restani, Judge<br><br>Court No. 24-00208 |

**OPINION**

[The court remands Customs' denial of plaintiff's customs broker's license.]

Dated: September 4, 2025

Jose Oscar Gonzalez, Gonzalez Rolon Valdespino & Rodriguez, LLC, of Dallas, TX, for plaintiff Brandon Chen. With him on the brief was Ruth Raquel Rodriguez.

Marcella Powell, U.S. Department of Justice, International Trade Field Office, of New York, NY, for defendants the United States, United States Customs and Border Protection, and United States Department of the Treasury. With her on the brief was Beverly A. Farrell.

      Restani, Judge: Plaintiff Brandon Chen ("Mr. Chen") brings this action to challenge the decision of U.S. Customs and Border Protection ("CBP" or "Customs") to uphold the denial of Mr. Chen's appeal of his result on the April 2022 Customs Broker License Exam ("CBLE"). Compl. at 1–2, ECF No. 4 (Nov. 25, 2024); Pl.'s Mot. for J. on the Agency R. Pursuant to Rule 56.1 and Supporting Br. at 1, ECF No. 17 (Apr. 7, 2025) ("Pl.'s Br."). Customs denied Mr. Chen's appeal based on his failure to attain a passing score of 75 percent or higher on the CBLE held on April 27, 2022 ("April 2022 exam"). Compl. at 1; Def.'s Mem. in Opp'n to Pl.'s Mot. for J. on the Agency R. at 3–4, ECF No. 24 (July 18, 2025) ("Defs.' Br."). Mr. Chen now appeals Customs'

decision to deny him credit for ten questions on the April 2022 exam. See Pl.'s Br. at 1. Should he receive credit for one of the ten contested questions, he would attain a passing score of 75 percent.

The government argues that Customs' decision to deny him credit for each of the contested questions is reasonable and supported by substantial evidence. See Defs.' Br. at 4, 7. The government asserts that he did not attain a passing score of 75 percent or higher on the April 2022 exam and, consequently, that Customs "did not abuse its discretion, act arbitrarily or capriciously, lack substantial evidence in reaching its decision, or otherwise violate the law." Id. at 33.

For the following reasons, Mr. Chen's motion for summary judgment is granted, and the issue of Customs' denial of Mr. Chen's application for a customs broker's license exam is remanded to Customs for implementation of this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Chen sat for the CBLE on April 27, 2022. See Administrative R. at 40, ECF No. 13 (Feb. 24, 2025) ("Admin. R."). On May 10, 2022, Customs notified Mr. Chen that he received a score of 66.25 percent—8.75 percent below the minimum passing score of 75 percent. Id. On July 7, 2022, Mr. Chen filed his first administrative appeal, challenging questions 13, 14, 29, 33, 36, 38, 39, 42, 44, 45, 46, 54, 63, 64, 72, and 78. Id. at 44. Customs notified Mr. Chen on March 3, 2023, that it sustained his score of 66.25 percent. Id. at 66. Mr. Chen filed a second administrative appeal on April 30, 2023, challenging the same questions. Id. at 68; see also Pl.'s Br. at 2. On October 3, 2024, Customs issued its second and final decision, granting credit for five of the contested questions while denying credit for the other eleven.[1] Admin. R. at 191. This

---

[1] Specifically, Mr. Chen received credit for questions 13, 33, 45, 64, and 72. See Admin. R. at 191.

resulted in a score of 72.50 percent, which is two questions short of the minimum passing score of 75 percent. Compl. at 1. Customs notified Mr. Chen that, while no further administrative appeal was permitted, he had a right to appeal the decision by filing an action in this court pursuant to 19 U.S.C. § 1641(e)(1) and 19 C.F.R. § 111.17. See Admin. R. at 191; see also Pl.'s Br. at 2.

On November 25, 2024, Mr. Chen filed his complaint in this court, challenging Customs' denial of credit for his answers to questions 14, 29, 36, 38, 39, 42, 44, 46, 54, 63, and 78. See Compl. at 2; Pl.'s Br. at 1. On July 18, 2025, the government filed its response brief in which it stated that Customs gave Mr. Chen credit for question 46. Defs.' Br. at 4 n.2. This raised Mr. Chen's score to 73.75 percent.[2] See id. Accordingly, if Mr. Chen receives credit on at least one of the remaining ten contested questions, he will receive the minimum passing score of 75 percent. See Admin. R. at 1. The court concludes that Mr. Chen should at least receive credit for question 38.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction to hear Mr. Chen's appeal pursuant to 28 U.S.C. § 1581(g)(1) ("The Court of International Trade shall have exclusive jurisdiction of any civil action commenced to review . . . any decision of the Secretary of Treasury to deny a customs broker's license.").

There are two elements of review that apply to appeals of applicants' results on the CBLE. See Kenny v. Snow, 401 F.3d 1359, 1361 (Fed. Cir. 2005). The first element addresses whether Customs' decision to deny an applicant credit for a contested question was supported by "substantial evidence." See id. at 1361–62 (concluding that the "decision to deny credit" for the contested question was "supported by substantial evidence") (citing 19 U.S.C. § 1641(e)(3)). The second element addresses whether Customs' decision to deny the applicant a customs broker's

---

[2] Each question on the exam is worth 1.25 points. See Admin. R. at 1.

license was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. at 1361 (citing 5 U.S.C. § 706 (2000)).

The court will not overturn Customs' decision to deny credit on a CBLE question where the factual findings are "supported by substantial evidence." Id. (citing 19 U.S.C. § 1641(e)(3)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (citing Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Notably, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent the agency's finding from being supported by substantial evidence." Depersia v. United States, 33 CIT 1103, 1104, 637 F. Supp. 2d 1244, 1247 (2009). Further, the standard of review regarding CBLE exam questions is one of reasonableness. See Rudloff v. United States, 19 CIT 1245, 1249 (1995), aff'd, 108 F.3d 1392 (Fed. Cir. 1997). "[A] question is fair [if] it reasonably tests 'an applicant's knowledge of customs and related laws, regulations and procedures.'" Id.

In considering appealed CBLE questions, the court recognizes that "the substantial evidence standard does not require that Customs draft perfect questions." Chae v. Yellen, 579 F. Supp. 3d 1343, 1351 (CIT 2022) (citing Di Iorio v. United States, 14 CIT 746, 748–49 (1990) ("While not perfect, the question was adequate so that, as to this question, plaintiff's appeal was rejected reasonably."); Harak v. United States, 30 CIT 908, 922–23 (2006) ("[A] question or answer choice need not reflect the precise wording of the regulation in order to be valid . . . Though the question is not a perfect reflection of the regulation's language, it is not inadequate.")). Customs is "entitled to certain latitude in the design and the scoring of" the exam, and the court does not act as "some kind of final reviewer" of the CBLE. Dunn-Heiser v. United States, 29 CIT 552, 556, 374 F. Supp. 2d 1276, 1280 (2005).

## DISCUSSION

### I.     Legal Background

Customs' regulations provide that "[t]he examination for an individual broker's license"—referred to as the CBLE—is "designed to determine the individual's knowledge of customs and related laws, regulations and procedures, bookkeeping, accounting, and all other appropriate matters necessary to render valuable service to importers and exporters." 19 C.F.R. § 111.13(a); see 19 U.S.C. § 1641(b)(2). The fact that this "comprehensive written licensing exam" constitutes one of the requirements to obtain a customs broker's license reflects the "complex[ity]" of the applicable statutes and regulations as well as the "integral role [of customs brokers] in international trade." Dunn-Heiser, 29 CIT at 553–54, 374 F. Supp. 2d at 1278.

Customs administers the CBLE twice a year, in April and October. 19 C.F.R. § 111.13(b). The exam consists of 80 multiple choice questions. Dunn-Heiser, 29 CIT at 554, 374 F. Supp. 3d at 1278. "The exam is open-book," and applicants are advised to bring certain specific materials to which they may refer during the exam, including the Harmonized Tariff Schedule of the United States ("HTSUS") and Title 19 of the Code of Federal Regulations. Id.

### I.     The Exam

Each challenged question is addressed in turn:

### A. Question 14

Mr. Chen appeals Customs' decision to deny him credit for question 14 on the April 2022 exam. See Pl.'s Br. at 19–20. Question 14 states:

> For General Order (GO) merchandise regularly landed but not covered by a permit for its release is authorized to remain at the place of unlading until the 15th calendar day after landing. If an entry has not been made for the merchandise, the owner, operator of an imported vehicle or agent must notify CBP no later than 20 calendar days after landing, a monetary penalty will be assessed. What is the greatest penalty amount per bill of lading that can be assessed?

        A.    $1,000.00
        B.    $1,500.00
        C.    $2,000.00
        D.    $3,000.00
        E.    $5,000.00

Admin. R. at 8. Customs designated answer choice (A) as the correct response to question 14, and Mr. Chen selected answer choice (E). Id. at 36, 42.

According to Mr. Chen, the question is premised on the existence of a mandatory penalty, but the regulation Customs uses to support its answer uses discretionary language; therefore, in his view, the question is flawed and should be disqualified. See Pl.'s Br. at 19–20.

Customs' decision to deny him credit for question 14 was supported by substantial evidence. The regulation that Customs bases its answer upon, 19 C.F.R. § 123.10(a), sets forth the requirements for General Order ("GO") merchandise. It states, in relevant part, that "[f]ailure to provide such notification may result in assessment of a monetary penalty of up to $1,000 per bill of lading against the owner or operator of the vehicle or the agent thereof." 19 C.F.R. § 123.10(a). Mr. Chen asserts that in contrast to this regulation, the wording of the exam question does not permit any discretion when it says "a monetary penalty will be assessed." Pl.'s Br. at 19–20 (emphasis added).

The language of the question closely tracks that of the regulation, and the correct answer is unambiguously stated. Despite the word "will" being used, the final sentence in the question prompt asks exam takers to select the "greatest" amount of monetary penalty that "can" be assessed. This phrasing corresponds well with the "may result" language of section 123.10(a).

      **B. Question 29**

Mr. Chen appeals Customs' decision to deny him credit for question 29 on the April 2022 exam. See Pl.'s Br. at 17–19. Question 29 states:

> What type of entry is required for goods brought into the customs territory of the United States by the National Aeronautics and Space Administration (NASA) from space or from a foreign country as part of an international program of NASA?
> A. 01 - Formal Entry
> B. 11 - Informal Entry
> C. 51 - Defense Contract Management Agency (DCMA) is the importer of record and filer of the entry
> D. 52 - Any U.S. Federal Government agency (other than DCMA) is the importer of record
> E. Entry is not required

Admin. R. at 13. Customs designated answer choice (E) as the correct response to question 29, and Mr. Chen selected answer choice (A). Id. at 37, 42.

According to Mr. Chen, there is a clash between 19 C.F.R. § 10.102(a) and subheading 9808.00.80 of the HTSUS that made this question ambiguous, thereby forcing him to guess the answer. Pl.'s Br. at 19. He concedes that subheading 9808.00.80 of the HTSUS states that no entry is required but claims that the ambiguity arises from 19 C.F.R. § 10.102(a) "allow[ing]" for subheading 9808.00.80, HTSUS, to be "permitted duty-free status." Id.

Customs' decision to deny him credit for question 29 was supported by substantial evidence. It relies upon subheading 9808.00.80 of the HTSUS and Additional U.S. Note 1 of Chapter 98 for its answer. See Defs.' Br. at 9–10. Subheading 9808.00.80, HTSUS, covers goods imported for use by NASA or one of its international programs. Id. at 10. Additional U.S. Note 1 of Chapter 98 states:

> With respect to subheading 9808.00.80, goods brought into the customs territory of the United States by the National Aeronautics and Space Administration from space or from a foreign country as part of an international program of the National Aeronautics and Space Administration shall not be considered an importation, and an entry of such materials shall not be required.

Chapter 98, Additional U.S. Note 1, Subchapter VIII, HTSUS.

Note 1 of Chapter 98 explicitly states that goods brought into the customs territory of the United States under subheading 9808.00.80, HTSUS, are not considered importations and entry of

them is not required.  Id.  Section 10.102(a), relied on by Mr. Chen, "governs the invoice and declaration requirements for goods entered duty-free . . . [it] does not prescribe the 'type of entry' for goods brought into the customs territory from space by NASA or a foreign country, nor does it impose entry requirements distinct from those required by Note 1 and subheading 9808.00.80, HTSUS."  Defs.' Br. at 11; 19 C.F.R. § 10.102(a).

    **C. Question 36**

Mr. Chen appeals Customs' decision to deny him credit for question 36 on the April 2022 exam.  See Pl.'s Br. at 20–21.  Question 36 states:

> A basic importation and entry bond must contain all of the following bond conditions **EXCEPT:**
>     A. If access to the customs security areas at airports is desired, the principal (including its employees, agents, and contractors) agrees to comply with the CBP regulations in 19 CFR, Chapter 1, applicable to customs security areas at airports.  If the principal defaults, the obligors (principal and surety, jointly and severally) agree to pay liquidated damages of $1,000 for each default or such other amount as may be authorized by law or regulation.
>     B. The principal agrees to keep safe any merchandise placed in its custody including, when approved by CBP, repack and transfer such merchandise when necessary for its safety or preservation.
>     C. If merchandise is released conditionally to the principal before all required documents or other evidence is produced, the principal agrees to furnish CBP with any document or evidence as required by law or regulation, and within the time specified by law or regulations.
>     D. If merchandise is released conditionally to the principal before its right to admission into the United States is determined, the principal, after notification, agrees to mark, clean, fumigate, destroy, export, or do any other thing to the merchandise in order to comply with the law and regulations governing its admission into the United States with the time period set in the notification.
>     E. If the principal obtains permission to have any merchandise examined elsewhere than at a wharf or other place in charge of a CBP officer, the principal agrees to hold the merchandise at the place of examination until the merchandise is properly released.

Admin. R. at 15.  Customs designated answer choice (B) as the correct response to question 36, and Mr. Chen selected answer choice (D).  Id. at 37, 42.

Mr. Chen does not contest the correctness of the answer; rather, he argues that the question is in violation of Customs' <u>Guidelines For Writing Questions For Customs Broker License Examination</u> by being "too long, too dense, too unwieldy, and too confusing to be considered a fair exam question." Pl.'s Br. at 20; Compl. at 5.

Customs' decision to deny him credit for question 36 is supported by substantial evidence. The answer is based on 19 C.F.R. § 113.62, which lists the conditions that are to be included in a basic importation and entry bond. Defs.' Br. at 13; 19 C.F.R. § 113.62. These conditions are listed verbatim in answer choices (A), (C), (D), and (E). Admin. R. at 15. The question was not defective.

### D. Question 38

Mr. Chen appeals Customs' decision to deny him credit for question 38 on the April 2022 exam. <u>See</u> Pl.'s Br. at 3–4. Question 38 requires the examinee to classify a book of crossword puzzles according to the correct provision of the HTSUS. Question 38 states:

> What is the **CLASSIFICATION** of a book of crossword puzzles? The book measures 6 inches (in) by 9 in, is softcover, and contains 75 pages of pre-printed crossword puzzles labeled as appropriate for adults.
> A. 4901.99.0093
> B. 4901.99.0092
> C. 4903.00.0000
> D. 9503.00.0090
> E. 9503.00.0013

Admin. R. at 16. Customs designated answer choice (D) as the correct response to question 38, and Mr. Chen selected answer choice (A). <u>Id.</u> at 37, 54.

Answer choice (D) classifies a book of crossword puzzles under heading 9503.00.0090, HTSUS, which covers "[t]ricycles, scooters, pedal cars, and similar wheeled toys; dolls' carriages; dolls, other toys; reduced-scale ('scale') models and similar recreational models, working or not; puzzles of all kinds; parts and accessories thereof; other." Chapter 95, HTSUS. Answer choice

(A) classifies a book of crossword puzzles under heading 4901.99.0093, HTSUS, which covers "[p]rinted books, brochures, leaflets and similar printed matter, whether or not in single sheets: Other; Containing 49 or more pages each (excluding covers)." Chapter 49, HTSUS.

Mr. Chen argues that a "book clearly and absolutely does not belong with the toys for little kids and babies of heading 9503" of the HTSUS. Pl.'s Br. at 5. Mr. Chen further asserts that a book of crossword puzzles is not "of the same kind" as the other items listed under heading 9503, HTSUS. Id. at 4–5. Additionally, he argues that the language "puzzles of all kinds" in heading 9503, HTSUS, does not include a book of crossword puzzles. Id. at 5–6. Rather, according to Mr. Chen, a book of crossword puzzles is a printed book that is better classified under heading 4901, HTSUS. Id. at 7–8.

Customs counters that the General Rules of Interpretation ("GRIs") govern tariff classification. Defs.' Br. at 14. Customs explains that per GRI 1, "classification shall be determined according to the terms of the headings and any relative section or chapter notes." Id. Customs notes that heading 9503, HTSUS, covers "puzzles of all kinds," which encompasses all forms of puzzles, including crossword puzzles. Id. at 15. Customs further points to Note 1(c) of Chapter 49 which provides that this chapter does not cover "playing cards or other goods of chapter 95." Id. These provisions together, according to Customs, require the classification of a book of crossword puzzles under heading 9503, HTSUS. Id.

Question 38 attempts to test the examinee's ability to apply the HTSUS including the "relative . . . chapter notes" provision of GRI 1. See Admin. R. at 16; GRI 1, HTSUS. As indicated, Note 1(c) to Chapter 49, states that "[t]his chapter does not cover . . . [p]laying cards or other goods of chapter 95." Chapter 49 Note 1(c), HTSUS. The two headings each contain terms that prima facie describe the imported article. See HTSUS 9503; HTSUS 4901. The examinee is meant to

choose the correct heading by applying classification principles and Chapter Note 1(c) that excludes from Chapter 49 any goods of Chapter 95, which would cover "puzzles of all kinds." The article imported here, however, was not simply a "puzzle" or "puzzles." Rather, it was a printed book that contained crossword puzzles. Admin. R. at 38. It is reasonable to interpret "puzzles of all kinds" to mean physical puzzles, like a jigsaw puzzle, rather than a printed book of pages. Further, while Chapter Note 1(c) specifically excludes "[p]laying cards," a book of crossword puzzles is as distinct from playing cards as it is from a physical puzzle. Chapter 49 Note 1(c), HTSUS.

The court concludes that question 38 is unfair because it does not test what is intended to be tested—the examinees ability to determine the correct heading through the application of customs law. A question is fair when it "reasonably tests 'an applicant's knowledge of customs and related laws, regulations and procedures.'" Rudloff, 19 CIT at 1249 (quoting 19 U.S.C. § 1641(b)(2)). Here, question 38 suggests two HTSUS headings that by their plain language cover the article imported. And as explained above, Note 1(c) of Chapter 49 does not help to clear up the confusion.[3] It begs the question of what is covered by Chapter 95. Because both answer choice (D) and answer choice (A) are acceptable answers, credit must be given for either.

E. **Question 39**

Mr. Chen appeals Customs' decision to deny him credit for question 39 on the April 2022 exam. See Pl.'s Br. at 11–12. Question 39 states:

> What is the **CLASSIFICATION** of a children's detangling hairbrush? It has a plastic handle and features soft bristles on a sponge base. The brush can be used on wet or dry hair and is valued at 52 cents each.
>     A. 9603.29.4010

---

[3] The court notes that it is possible the writers of the CBLE viewed this question as more clear cut than it is based on prior versions of the HTSUS. Prior to 2007, subheading 9503.60.10 covered "Puzzles and parts and accessories thereof: Crossword puzzle books." See HTSUS 9503 (2006).

        B.  9603.29.8010
        C.  9603.30.6000
        D.  9603.90.8050
        E.  9615.11.3000

Admin. R. at 16. Customs designated answer choice (B) as the correct response to question 39, and Mr. Chen selected answer choice (E). Id. at 37, 42.

      Mr. Chen argues that a children's detangling hairbrush is a better fit under heading 9615 of the HTSUS than under heading 9603. Pl.'s Br. 11–12. He contends that the children's hairbrush described in the question "is very much like a comb, hair-slides and the like; hairpins, curling pins, and hair-curlers of Heading 9615[]" of the HTSUS. Id. at 12. He argues that a children's hairbrush does not fit in with the items listed in heading 9603, HTSUS, which he characterizes as "industrial machinery." Id.

      Customs' decision to deny Mr. Chen credit for question 39 is supported by substantial evidence. Like question 38, the answer to question 39 is determined in part by a GRI 1 analysis and the headings in the HTSUS. Heading 9603, HTSUS, includes: "Brooms, brushes (including brushes constituting parts of machines, appliances or vehicles), hand-operated mechanical floor sweepers, not motorized, mops and feather dusters; prepared knots and tufts for broom or brush making; paint pads and rollers; squeegees (other than roller squeegees)." Heading 9615, HTSUS, includes: "Combs, hair-slides and the like; hairpins, curling pins, curling grips, hair-curlers and the like, other than those of heading 8516, and part thereof." Heading 9615, HTSUS, makes no mention of brushes, while heading 9603, HTSUS, clearly does.

    F.  **Question 42**

      Mr. Chen appeals Customs' decision to deny him credit for question 42 on the April 2022 exam. See Pl.'s Br. at 12–14. Question 42 states:

> Best Seafood Import Company is entering a product called "Bonito del Norte" from Spain. The fish is in pieces, packaged in glass jars and is invoiced as "Bonito del Norte, White Tuna in Olive Oil." The documents provided include National Oceanic and Atmospheric Administration (NOAA) Form 370 "Fisheries Certificate of Origin", which lists "Thunnus Alalunga in Oil" under the "Description of Fish" section, and a Captain's Statement stating that no dolphins were harmed during the catch. What is the **CLASSIFICATION** of this product?
>    A. 0302.31.0000
>    B. 1604.14.1091
>    C. 1604.14.2259
>    D. 1604.14.7000
>    E. 1604.19.2500

Admin. R. at 18. Customs designated answer choice (B) as the correct response to question 42, and Mr. Chen selected answer choice (A). Id. at 37, 42.

Mr. Chen argues that Customs treats "prepared fish" and "fresh or chilled" fish as mutually exclusive when they are not necessarily so. Pl.'s Br. at 13. He also takes issue with the lack of definitions for those phrases and that the HTSUS does not state that the two are mutually exclusive. Id. at 13–14.

Customs' decision to deny Mr. Chen credit for question 42 is supported by substantial evidence. Under a GRI 1 analysis, the exam taker should examine the terms of the headings together with any chapter or section notes. GRI 1, HTSUS. Heading 0302, HTSUS, covers: "Fish, fresh or chilled, excluding fish fillets and other fish meat of heading 0304." Heading 1604, HTSUS, covers: "Prepared or preserved fish; caviar and caviar substitutes prepared from fish eggs." Additional U.S. Note 1 to Chapter 16 states: "For purposes of this chapter, the term 'in oil' means packed in oil or fat, or in added oil or fat and other substances, whether such oil or fat was introduced at the time of packing or prior thereto." Chapter 16, Additional U.S. Note 1, Section IV, HTSUS ("Preparations of meat, of fish . . ."). Classification under these headings depends on the condition of the fish at the time of importation into the United States. Nothing in the question

indicated the fish was chilled or fresh; its suspension in oil is clearly indicative of its "prepared" and "preserved" nature.

### G. Question 44

Mr. Chen appeals Customs' decision to deny him credit for question 44 on the April 2022 exam. See Pl.'s Br. 14–16. Question 44 states:

> What is the **CLASSIFICATION** for a 1,080-pixel high-definition camera with an interchangeable lens and three-inch liquid crystal display (LCD) that captures both still images and moving images?
> A. 8519.89.3000
> B. 8525.80.4000
> C. 8525.80.5015
> D. 8525.80.5050
> E. 8527.12.0000

Admin. R. at 18. Customs designated answer choice (B) as the correct response to question 44, and Mr. Chen selected answer choice (D). Id. at 37, 42.

Mr. Chen argues that Customs' answer, 8525.80.4000, HTSUS, cannot be correct and should be disqualified because it lacks the term "moving images" in its subheading. Pl.'s Br. at 16. He also claims that to understand the term "digital still image video cameras" requires "precise technical knowledge." See id. at 15.

Customs' decision to deny Mr. Chen credit for question 44 is supported by substantial evidence. As with the previous GRI 1 classification analyses, the headings, chapter notes, and section notes are the first considerations. GRI 1, HTSUS. Both Mr. Chen and the defendants agree that heading 8525, HTSUS, is the proper heading. Pl.'s Br. at 14; Defs.' Br. at 23. After deciding which heading is correct, the exam taker must determine which subheading correctly identifies the merchandise. See Admin. R. at 18. Customs' answer, 8525.80.4000, HTSUS, classifies the merchandise as digital still image video cameras. Admin. R. at 37; HTSUS 8525. Mr. Chen's answer, 8525.80.5050, classifies the merchandise as "other." Pl.'s Br. at 14; HTSUS 8525.

While Mr. Chen failed to understand that "moving images" are indicative of a camera's video capability, making that connection does not require "precise technical knowledge." The term "digital still image video camera" is unambiguous and does not need the inclusion of a conjunction such as "and" between "still image" and "video camera" to be commonly understood, as Mr. Chen asserts.

### H. Question 54

Mr. Chen appeals Customs' decision to deny him credit for question 54 on the April 2022 exam. See Pl.'s Br. at 21–22. Question 54 states:

> The new owner of a previously recorded trademark would like to continue the recordation with CBP. The trademark is for an item with a gray market counterpart the owner would like protection against based on physical and material differences. The following are all actions the owner must take to continue the recordation **EXCEPT:**
> A. Pay a fee of $80.00 which covers all trademarks included in the application
> B. State the basis for the asserted physical and material differences with particularity and competent evidence with summaries of the differences for publication in the Customs Bulletin
> C. The identity of any parent or subsidiary company or other foreign company under common ownership (only for those with aggregate ownership of more than 40% of the business entity) and common control which uses the trademark abroad
> D. Describe any time limit on the right of ownership transferred
> E. Submit a status copy of the certificate of registration certified by the U.S. Patent and Trademark Office showing the title to be presently in the new owner's name

Admin. R. at 21. Customs designated answer choice (C) as the correct response to question 54, and Mr. Chen selected answer choice (B). Id. at 38, 42.

Mr. Chen argues that question 54's "meaning is obscure and its structure clumsy and flawed." Pl.'s Br. at 22. Because the question states, "[t]he following are all actions the owner must take to continue the recordation," Mr. Chen contends that all the answer choices that follow should be in the form of actions, because to do otherwise makes the answer choices "impenetrable and confusing." Id. Therefore, according to Chen, because the correct answer lacks an action verb, the question should be struck, and he should receive credit. Id.

The court notes that the government's explanation in its brief is convoluted. Defs.' Br. at 25–28. Mr. Chen's chosen answer, however, was incorrect. The answer to the question is reflected in 19 C.F.R. § 133.2(e), governing protection from gray market goods, and in 19 C.F.R. § 133.7, governing continuation of trademark protections.[4] Mr. Chen did not select the one answer not included in either, as he was directed to do by the question. See Admin. R. at 21. It is unlikely that the answer choices are "impenetrable and confusing" because one option lacked an action verb. In fact, that makes the answer more likely. In addition, answer (C) does not correspond exactly to any requirement as the percentage specified in section 133.2(d) is different. See 19 C.F.R. § 133.2(d). Thus, it should have been selected. The court further notes that this question is one that should be reworded in the future as it asks for the analysis of too many provisions, but as Mr. Chen otherwise has succeeded in his challenge the court will not address it further.

I. Question 63

Mr. Chen appeals Customs' decision to deny him credit for question 63 on the April 2022 exam. See Pl.'s Br. at 22–23. Question 63 states:

> A shipment has arrived on an East coast port with an arrival date of Monday, May 4, 2020, at 11:05AM Eastern Time (ET). The error-free entry summary, with payment, is submitted at the arrival port on Thursday, May 7, 2020, at 16:40PM ET. What is the presentation date and time for non-opening moment quota purposes?
>   A. Monday, May 4, 2020 – 11:05AM ET
>   B. Tuesday, May 5, 2020 – 08:00AM ET
>   C. Thursday, May 7, 2020 – 16:40PM ET
>   D. Friday, May 8, 2020 – 08:30AM ET
>   E. Friday, May 8, 2020 – 09:00AM ET

Admin. R. at 26. Customs designated answer choice (D) as the correct response to question 63, and Mr. Chen selected answer choice (B). Id. at 38, 42.

---

[4] The question may also implicate 19 C.F.R. § 133.5 regarding new ownership. Section 133.5(a) incorporates all of section 133.2.

Mr. Chen argues that because it is unclear whether there is stipulation of authorization for overtime services, the question should not be counted against his score. Pl.'s Br. at 23. The question does not explicitly state that overtime services had been authorized, but it also does not explicitly state that overtime services had not been authorized. Id.

Customs' decision to deny Mr. Chen credit for question 63 is supported by substantial evidence. Customs, in support of its answer choice (D), states that the entry was made "without stipulating authorization for overtime services." Id.; Defs.' Br. at 30. Customs' answer choice is consistent with 19 C.F.R. § 132 and 19 C.F.R. § 141.62(b)(2)(ii), the regulations it cited to support its answers. Defs.' Br. at 28–30. Mr. Chen asserts that answer choice (C) would be correct if overtime services were authorized. Pl.'s Br. at 23. Notably, Mr. Chen selected answer choice (B). Admin. R. at 54. For this reason, Mr. Chen's argument lacks merit; he did not select (C) or (D), which he argues are the two possible correct answers depending on the authorization status. It is unreasonable to grant him credit on this basis.

Assuming arguendo, that Mr. Chen had selected answer choice (C), he would still be incorrect as he made assumptions and included information in his analysis beyond what "the fact pattern provided." See Depersia, 33 CIT at 1111, 637 F. Supp. 2d at 1252. The court has stated that assumptions "to include possibilities beyond what 'the fact pattern provided' cannot be reasonably found to be the best answer." Stoute-Francois v. Yellen, 766 F. Supp. 3d 1315, 1322 (CIT 2025) (quoting Depersia, 33 CIT at 1111, 637 F. Supp. 2d at 1252).

J. **Question 78**

Mr. Chen appeals Customs' decision to deny him credit for question 78 on the April 2022 exam. See Pl.'s Br. at 23–25. Question 78 states:

> Under which scenario can a broker bill a freight forwarder (FF) for Customs duties without sending a copy to the importer?

    A. The broker obtains a Sub-Power of Attorney (POA) from the FF, on behalf of the importer, and a valid POA from the importer.
    B. The importer is told in advance the name of the FF selected by the broker to handle their Customs transactions.
    C. The importer is told in advance the name of the FF selected by the broker to handle their Customs transactions and the broker transmits directly to the FF, a true copy of the brokerage charges for the fees and charges collected by or through the forwarder.
    D. The broker is provided a POA from the FF, on behalf of the importer, to handle the importer's Customs transactions.
    E. The broker is provided the importer's signed waiver of the requirement to receive a true copy of the broker charges, when fees and charges are to be collected by or through the FF, and the importer is told in advance the name of the broker selected by the FF to handle their Customs transactions.

Admin. R. at 35. Customs designated answer choice (E) as the correct response to question 78, and Mr. Chen selected answer choice (D). Id. at 39, 42.

    Mr. Chen argues that the question does not make sense because brokers cannot bill a freight forwarder for Customs duties, therefore he should receive credit for the question. Pl.'s Br. at 24. According to Mr. Chen, only Customs can bill and collect customs duties from importers. Id. at 24–25.

    Customs' decision to deny Mr. Chen credit for question 78 is supported by substantial evidence. The answer to this question is grounded in 19 C.F.R. § 111.36(a), which states:

> When a broker is employed for the transaction of customs business by an unlicensed person who is not the actual importer, the broker must transmit to the actual importer either a copy of his bill for services rendered or a copy of the entry, unless the merchandise was purchased on a delivered duty-paid basis or unless the importer has in writing waived transmittal of the copy of the entry or bill for services rendered.

19 C.F.R. § 111.36(a).

    An exception under this section is made when the importer "has in writing waived transmittal of the copy of the entry or bill for services rendered," which is clearly reflected in answer choice (E). See id.; Admin. R. at 35. The court agrees with the government that Mr. Chen "conflat[ed] the issuance of a bill by [Customs]" with "the issuance of a bill by a licensed customs

broker." Defs.' Br. at 32. The issuance of a bill by Customs is not relevant to this question. The question is asking the exam taker to identify a situation in which a licensed customs broker may send a bill on behalf of an importer to a freight forwarder rather than directly to an importer. See Admin. R. at 35.

## II. Customs Broker's License Denial

In reviewing Customs' decision to deny a customs broker's license, the court is required to determine whether such a decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A lawful ground for such a decision is an applicant's failure to pass the CBLE. 19 U.S.C. § 1641(b)(2); 19 C.F.R. § 111.16(b)(2).

As discussed, a passing score on the CBLE is 75 percent or higher. 19 C.F.R. § 111.11(a)(4). To successfully appeal a result on the CBLE, an examinee is required to establish entitlement to credit for the "minimum" number of questions that the applicant requires to achieve a passing score. Harak, 30 CIT at 929.

Mr. Chen's score on the April 2022 exam was 73.75 percent. Based on the foregoing analysis, the court concludes that Customs' decision to deny Mr. Chen credit for question 38 was not supported by substantial evidence. Accordingly, Mr. Chen meets the "minimum threshold" to establish entitlement to credit for question 38. See id. For this reason, Customs' decision to deny Mr. Chen a customs broker's license on the basis of his exam score was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## CONCLUSION

Mr. Chen's motion for summary judgment, ECF No. 17, is granted. This matter is remanded to give credit for question 38 consistent with this opinion.

/s/ Jane A. Restani
Jane A. Restani, Judge

Dated: September 4, 2025
New York, New York